**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

City of Phoenix,

                Plaintiff,

v.

First State Insurance Company; Twin City Fire Insurance Company; New England Reinsurance Corporation; Nutmeg Insurance Company,

                Defendants.

No. CV-15-00511-PHX-NVW

**ORDER**

## TABLE OF CONTENTS

I.     LEGAL STANDARD ................................................................................ 1

II.    UNDISPUTED MATERIAL FACTS................................................................ 2

       A.    Asbestos lawsuit against the City................................................ 2

       B.    The City's liability insurance ................................................... 2

             1.    The Hartford's excess policies ........................................... 3

                  a.    Duty to indemnify against liability .......................... 3

                  b.    Duty to pay defense costs, but not to defend .......................... 4

             2.    The Hartford's umbrella policies ....................................... 5

                    a.    Duty to indemnify against liability and defense costs ............ 6

                    b.    Duty to defend.......................................................... 8

C.    The City's communication with The Hartford regarding the asbestos lawsuit ........................................................................................... 9

III.    INTERPRETATION OF THE INSURANCE POLICIES .................................... 11

    A.    Excess policies ......................................................................................... 12

        1.    The Hartford has no duty to indemnify the City for any of the settlement. ......................................................................................... 12

        2.    The Hartford has no duty to pay any of the City's defense costs because the City settled within its retained limit. ............................ 14

        3.    Alternatively, reimbursement of defense costs is allocated across policy periods and no year exceeds the City's retained limit, however calculated. ........................................................................... 18

    B.    Umbrella policies ..................................................................................... 23

        1.    The Hartford has no duty to indemnify the City for any of the settlement or defense costs in this case. ............................................ 24

        2.    The Hartford had no duty to provide a defense. ................................ 25

IV.    BAD FAITH ...................................................................................................... 27

    A.    Processing of claim ................................................................................. 28

    B.    Denial of claim ........................................................................................ 29

V.    EXPERT TESTIMONY .................................................................................... 30

VI.    MOTION TO TRANSFER ............................................................................... 33

From 1981 to 1985, Defendants insured the City of Phoenix against liability for bodily injury occurring during that time.  The insurance applied only to liability incurred above the City's $500,000 self-insured retention.  In 2013, a third party sued the City for bodily injury caused by asbestos exposure that occurred from 1967 to 1993.  The City settled the lawsuit for $500,000 and spent more than $1,400,000 in defense costs.  Defendants denied coverage for these expenses.  The City claims Defendants violated their policy terms and acted in bad faith.

Before the Court are Defendants' Motion for Summary Judgment (Doc. 65), the City's competing Motion for Partial Summary Judgment (Doc. 68), and the parties' briefs and statements of facts.  For the reasons explained in Parts I–IV below, Defendants' motion will be granted and the City's motion will be denied.

Also before the Court is Defendants' Motion to Exclude Expert Testimony of Jeffrey Stempel (Doc. 67) and the accompanying briefs.  Although summary judgment does not depend on whether Stempel's testimony is admissible, Defendants' motion to exclude will be granted in part, as explained in Part V below.

Also before the Court is Defendants' Motion to Transfer Related Case (Doc. 78) and the accompanying briefs.  For the reasons explained in Part VI below, the motion will be denied.

## I.      LEGAL STANDARD

Summary judgment is proper where there is no genuine dispute about a material fact.  Fed. R. Civ. P. 56(a).  A material fact is one that "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A genuine dispute of material fact exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*

The movant has the burden of showing the absence of any genuine dispute of material fact.  *Id.* at 256.  If that burden is met, the nonmovant must set forth "specific facts showing that there is a genuine issue for trial."  *Id.*  In deciding a motion for

summary judgment, the Court must not weigh evidence or make credibility determinations, and must draw all justifiable inferences in the nonmovant's favor. *Id.* at 255. Where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

## II.    UNDISPUTED MATERIAL FACTS

The following facts are drawn from undisputed portions of the parties' statements of facts (Docs. 66, 69) and attachments thereto.

### A.    Asbestos lawsuit against the City

In April 2013, Carlos Tarazon served a Notice of Claim on the City of Phoenix, alleging he had developed cancer from working for the City with asbestos-laden pipes from 1967 to at least 1993. The Notice offered to settle Mr. Tarazon's claims against the City for $10,500,000. After the offer expired, Mr. Tarazon died, and his surviving spouse sued the City and others in state court.

In November 2014, Ms. Tarazon renewed the $10,500,000 settlement offer. Days later, she offered to settle for $7,000,000 instead. In April 2015, the City and Ms. Tarazon agreed to settle for $500,000. The City ultimately spent $1,486,031.68 in attorney's fees and costs (collectively, "defense costs"), on top of the settlement payment.

### B.    The City's liability insurance

During the twenty-six years in which Mr. Tarazon was exposed to asbestos, the City was insured under a variety of policies. In the present lawsuit, the City seeks coverage only under policies in place during four of those years: from July 1, 1981 to July 1, 1985. Defendants, the issuers of those policies, are second- and third-tier subsidiaries of The Hartford Financial Services Group. (Doc. 5.) They will be individually and collectively referred to as "The Hartford."

The Hartford's policies insured the City against liability incurred above the City's $500,000 self-insured retention. The self-insured retention was in place of prior primary

insurance.[1]   The policies were of two types: excess policies and umbrella policies. Excess policies were in place during all four years, and umbrella policies were in place during three of those years.  Although policy terms differed slightly from year to year, the basic setup was the same.  The policies in place during the first year are representative. (Doc. 69-2 at 2–25; Doc. 69-3 at 28–45.)

### 1.    The Hartford's excess policies

Under the excess policies, The Hartford agreed to (1) indemnify the City against liability incurred above $500,000 but not above $1,000,000 and (2) pay a share of the City's defense costs in cases where liability is adjusted for more than $500,000. Although The Hartford had a right to associate with the City at its own cost in the defense of claims likely to exceed $500,000, it had no duty to do so.

### a.    Duty to indemnify against liability

According to the declarations page, the excess policies covered "excess liability" above the City's $500,000 self-insured retention.  (Doc. 69-2 at 2.)  The self-insured retention was referred to as the "retained limit."  (*Id.* at 3–4, 14.)  In the basic insuring clause, The Hartford agreed to indemnify the City for "ultimate net loss" due to bodily injury liability in excess of the "retained limit":

> . . . [T]he [Hartford] agrees with the [City] and will indemnify the [City] for ultimate net loss in excess of the retained limit hereinafter stated which the [City] shall become legally obligated to pay by reason of liability imposed by law, or liability assumed by contract, insofar as the [City] may legally do so for damages because of . . . bodily injury liability . . . .

---

[1] The Hartford presents the Court with internal City documents so describing the self-insured retention.  (Doc. 66 at ¶¶ 21–38.)  The City says these documents are irrelevant to interpreting The Hartford's policies because they are not evidence of the parties' mutual intent. (Doc. 75 at ¶¶ 21–38; Doc. 74 at 6–8.)  Although these documents are relevant in showing the City's own intention to have the same rights and obligations of a primary insurer, the Court need not consider the documents because that intention is obvious from the terms and structure of The Hartford's policies.

(*Id.* at 3.)  "Ultimate net loss" meant settlements or judgments for which the City is liable, including court-awarded fees and costs but excluding loss adjustment expenses:

> "Ultimate Net Loss" means the sum actually paid or payable in cash in the settlement or satisfaction of losses for which the [City] is liable either by adjudication or compromise . . . and includes attorney's fees, court costs and interest on any judgment or award, but excludes all loss adjustment expenses and all salaries of employees and office expenses of the [City], [The Hartford] or any underlying insurer so incurred.

(*Id.* at 10.)

Coverage extended to liability "caused by an occurrence, during the policy period."  (*Id.* at 3.)  "Occurrence" included "an accident, or event including continuous or repeated exposure to conditions, which results during the policy term, in bodily injury."  (*Id.* at 9.)  Coverage was limited to $500,000 above the retained limit.  (*Id.* at 2, 14.)  The City paid a premium of $132,060.  (*Id.* at 2.)

### b.     Duty to pay defense costs, but not to defend

The excess policies contained a separate section titled "Defense, Settlement and Supplementary Payments."  (Doc. 69-2 at 3.)  This section gave The Hartford the right to associate with the City in defending claims "reasonably likely" to involve The Hartford:

> The [Hartford] shall have the right and opportunity to associate with the [City] in the defense and control of any claim or proceeding arising out of an occurrence reasonably likely to involve [The Hartford].  In such event, the [City] and [The Hartford] shall cooperate fully.

(*Id.*)  It also prohibited the City from incurring costs on behalf of The Hartford without its consent, which could not be unreasonably withheld, in defending claims that "appear likely" to exceed the retained limit:

> Should any occurrence appear likely to exceed the retained limit, no loss expense or legal expense shall be incurred on behalf of [The Hartford] without its prior consent.  Such consent shall not be unreasonably withheld.

(*Id.*)

The section also identified two circumstances governing The Hartford's duty to contribute to the City's defense costs.  First, as to claims against the City that are "adjusted" for equal to or less than the retained limit, The Hartford would pay no defense costs:

> Should any claim arising from such occurrence be adjusted prior to trial court judgment for a total amount not more than the retained limit, then no loss expenses or legal expenses shall be payable by [The Hartford].

(*Id.*)  Second, as to claims against the City that "might be adjusted" for more than the retained limit, The Hartford would pay a share of defense costs in proportion to any liability incurred above the retained limit, with the caveat that the City would pay no more than the retained limit in defense costs:

> However, should the total amount for which such claim might be adjusted prior to such judgment exceed the retained limit, then if [The Hartford] consents to further trial court proceedings, it shall contribute to legal expenses in the ratio which its proportion of the liability for the judgment rendered, or settlement made, bears to the whole amount of said judgment or settlement, however in no event shall the [City's] participation in such legal expenses exceed the retained limit . . . .

(*Id.*)  Although The Hartford had a duty in some circumstances to reimburse the City for some costs spent in litigation, it never had a duty to participate in the defense of claims during litigation.

### 2.     The Hartford's umbrella policies

Under the umbrella policies, The Hartford agreed to indemnify the City against liability and defense costs incurred above the excess policies' limit, as well as certain other liability and defense costs.  The Hartford also had the option to provide a defense or leave it to the City to provide its own defense.  Either way, the defense costs incurred by

either the City or The Hartford were part of the ultimate net loss that The Hartford must indemnify up to the umbrella policies' limit.

### a.   Duty to indemnify against liability and defense costs

The umbrella policies insured the City in two ways.  First, they added a layer of excess insurance, covering types of liability that fell within the scope of the excess policies but exceeded the excess policies' upper limit.  For this reason, the declarations page contained a schedule of "Underlying Insurance Policies" that listed the excess policies' $500,000 limit, which was itself "excess of" the City's $500,000 self-insured retention.  (Doc. 69-3 at 28.)  Second, the umbrella policies covered types of liability that fell outside the scope of the excess policies but exceeded a smaller self-insured retention.  For this reason, the declarations page listed a separate $25,000 "self-insured retention." (*Id.*)

Dual coverage is typical of umbrella policies.  "Umbrella policies differ from standard excess insurance policies in that they are designed to fill gaps in coverage both vertically (by providing excess coverage) and horizontally (by providing primary coverage)."  *Commercial Union Ins. Co. v. Walbrook Ins. Co.*, 7 F.3d 1047, 1053 (1st Cir. 1993).  Interpretive issues may relate to one type of coverage but not the other.  *E.g.*, *Coleman Co. v. California Union Ins. Co.*, 960 F.2d 1529, 1530 n.1 (10th Cir. 1992) ("The issue before us relates solely to the excess component of the umbrella policy.").

Accordingly, in the basic insuring clause, The Hartford agreed to indemnify the City for "ultimate net loss" due to bodily injury in excess of "the underlying limit or the self-insured retention, whichever is the greater":

> The [Hartford] will indemnify the [City] for ultimate net loss
> in excess of the underlying limit or the self-insured retention,
> whichever is the greater, because of . . . bodily injury . . . .

(*Id.* at 41.)   The "underlying limit" was defined as the coverage limit of the excess policies.  (*Id.* at 44.)  The "self-insured retention" was defined as the amount listed on the declarations page and did not apply to types of liability covered by the excess policies.

(*Id.*) Thus, where the type of liability fell within the scope of the excess policies, the underlying limit of the excess policies ($1,000,000) would be "the greater" and The Hartford would indemnify ultimate net loss above that amount.  Conversely, in cases where the type of liability fell outside the scope of the excess policies, the separate self-insured retention ($25,000) would be "the greater" and The Hartford would indemnify ultimate net loss above that amount.  It is undisputed that the City's asbestos liability fell within the scope of the excess policies (*see* Doc. 68 at 8), so this case involves The Hartford's duty to indemnify loss above $1,000,000.  This case does not involve liability outside the scope of the excess policies, such as aircraft-related liability (*see* Doc. 69-2 at 5), as might trigger The Hartford's duty to indemnify loss above $25,000.

Unlike in the excess policies, "ultimate net loss" in the umbrella policies included not just settlements and judgments, but defense costs too:

> "[U]ltimate net loss" means the total of the following amounts arising with respect to each occurrence to which this policy applies:
>
> (1) all sums which the [City], or any organization as [its] insurer, or both, shall become legally obligated to pay as damages, whether by reason of adjudication or settlement, because of bodily injury . . . , and
>
> (2) all expenses incurred by the [City] or [The Hartford] in the investigation, negotiation, settlement and defense of any claim or suit seeking such damages, excluding only the salaries of the [City's] or [The Hartford's] regular employees.

(Doc. 69-3 at 44.)

Coverage extended to liability "caused by an occurrence which takes place anywhere in the world." (*Id.* at 41.)  "Occurrence" meant "an accident, including continuous or repeated exposure to conditions, which results in bodily injury." (*Id.* at 44.)  The City paid a premium of $21,053 for the first year. (*Id.* at 28.)

- 7 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**b.     Duty to defend**

The umbrella policies contained a separate section titled "Investigation, Defense, Settlement." (*Id.* at 41.) The first sentence stated that The Hartford will defend claims against the City "to which this policy applies" and "which no underlying insurer is obligated to defend," and if The Hartford did undertake the defense, it would control the defense and the settlement:

> The [Hartford] will defend any claim or suit against the [City] seeking damages on account of injury or damage, to which this policy applies and which no underlying insurer is obligated to defend, but may make such investigation, defense and settlement thereof as it deems expedient . . . .

(*Id.*) But the second sentence allowed The Hartford to "elect[] not to . . . defend," in which event the City must provide a defense under The Hartford's supervision and settle the case only with The Hartford's approval:

> If [The Hartford] elects not to investigate, settle or defend any such claim or suit, the [City] under the supervision of [The Hartford] shall arrange for such investigation and defense thereof as are reasonably necessary, and subject to prior authorization of [The Hartford], shall effect such settlement thereof as [The Hartford] and the City deem expedient.

(*Id.*) Unlike in the excess policies, defense costs incurred by either the City or The Hartford count against the umbrella policies' limits:

> All expenses incurred by [The Hartford] or the [City] in the investigation, settlement and defense of claims or suits shall be charged against the limit of [The Hartford's] liability with respect to ultimate net loss. . . .

(*Id.*) Thus, the City's defense costs are part of the ultimate net loss and reimbursable by The Hartford up to the umbrella policies' limit. That limit varied from year to year, but the first-year limit was "$10,000,000 part of $20,000,000." (*Id.* at 28.)

- 8 -

### C.     The City's communication with The Hartford regarding the asbestos lawsuit

On May 2, 2014, the City notified The Hartford of the pending asbestos lawsuit. (Doc. 69-4 at 2–5.)  The City maintained that it had "exceeded" the retained limit under The Hartford's excess policies "by expending more than $500,000 for its legal defense." (*Id.* at 3.)  Accordingly, the City "demand[ed] that [The Hartford] unconditionally and fully defend and indemnify Phoenix against any liability" in the lawsuit.  (*Id.* at 2.)

On May 9, The Hartford sent a response letter.  (Doc. 66-21.)  The letter asked for the City's "assistance in helping [The Hartford] determine [its] coverage obligations, if any," for the asbestos lawsuit.  (*Id.* at 2.)  The letter specifically requested, among other things, proof that the City exhausted the retained limit under the insurance policies.  (*Id.* at 3.)

On October 14, the City sent a follow-up letter claiming coverage under the excess and umbrella policies.  (Doc. 69-4 at 7–8.)  The City stated that it "expects The Hartford to communicate its coverage position in writing within 10 days of receipt of this letter." (*Id.* at 8.)

On November 6, the City sent another letter.  (*Id.* at 10–12.)  The City stated that it "expects The Hartford to immediately acknowledge receipt of our prior correspondence and advise when it will produce a written coverage position."  (*Id.* at 10.)  As "proof of exhaustion" of the retained limit, the letter included an email from the City's attorney stating that the City had spent more than $1,000,000 so far defending the asbestos lawsuit.  (*Id.* at 11.)  The City also noted that Ms. Tarazon had renewed her settlement offer of $10,500,000.  (*Id.*)

That day, The Hartford told the City in an email that the retained limit "must be horizontally exhausted," i.e., that "the duty to defend under the excess policies is not triggered until all of the [retained limits] on the triggered policies has [sic] been exhausted."  (*Id.* at 14.)  The email also requested "invoices and canceled checks as proof of exhaustion."  (*Id.*)

On November 7, the City informed The Hartford by email that Ms. Tarazon had offered to settle for $7,000,000. (Doc. 69-1 at 114.)

On November 18, The Hartford repeated its request for "billing records." (Doc. 69-4 at 16.)

On December 18, the City sent The Hartford billing records showing more than $1,000,000 in defense costs. (*Id.* at 18–21.)

On January 13, 2015, The Hartford stated in an email that it "requires the billing records in order to determine whether or not the [retained limits] have been properly exhausted" and that "billing records are a threshold issue that must be addressed prior to [The] Hartford issuing a coverage position." (*Id.* at 23.) The City pointed out that this statement "suggests that you have not reviewed the billing records we provided to you on December 18." (*Id.*)

On January 23, The Hartford emailed the City to arrange a conference call. (Doc. 66-25 at 3.) In a follow-up email, The Hartford stated that the purpose of the call would be to discuss whether the City had exhausted the policies' retained limits, given the long duration of the asbestos exposure. (*Id.*) The Hartford also stated that it "just recently received the invoices" for the defense costs. (*Id.*)

On March 5, the City notified The Hartford that it offered to settle with Ms. Tarazon for $500,000 because a reasonable verdict could reach $1,500,000. (Doc. 69-4 at 27.) The Hartford responded that it "neither approves nor disapproves of the settlement" and maintained that it was "not participating in the defense" of the lawsuit because "the City has not exhausted its retained limits." (*Id.*)

The City brought this action against The Hartford on its excess and umbrella policies covering all four years it was on the risk. The City claims that The Hartford (1) breached one or more of its insurance contracts by refusing to pay the City's settlement payment and defense costs in the asbestos lawsuit and (2) acted in bad faith by refusing to make the above payments and by failing to timely investigate and respond to the City's

coverage claims.   (The City also seeks declaratory judgment as to The Hartford's coverage obligations, but declaratory judgment is unwarranted because the coercive remedy of damages is adequate to adjudicate all claims.)

The City moves for summary judgment on its breach of contract and declaratory judgment claims.   (Doc. 68.)   The Hartford cross-moves for summary judgment on all claims.   (Doc. 65.)   Oral argument was held on August 16, 2016.

## III.   INTERPRETATION OF THE INSURANCE POLICIES

The parties agree that Arizona law applies.   Interpretation of an insurance policy is a question of law.   *Sparks v. Republic Nat. Life Ins. Co.*, 132 Ariz. 529, 534, 647 P.2d 1127, 1132 (1982).   Provisions are to be construed according to their "plain and ordinary meaning" and in a way that gives "reasonable and harmonious meaning and effect" to all provisions.   *Id.* at 534–36, 647 P.2d at 1132–34 (citation omitted).   If a provision appears ambiguous, courts look to other interpretive guides such as legislative goals, social policy, and the transaction as a whole.   *First Am. Title Ins. Co. v. Action Acquisitions, LLC*, 218 Ariz. 394, 397, 187 P.3d 1107, 1110 (2008).   If ambiguity remains after considering these factors, the provision is to be construed against the insurer.   *Id.*   The City was a sophisticated insured and self-insurer.

The parties agree that the asbestos exposure was an "occurrence" that triggered The Hartford's policies.   The question is whether the City's $500,000 settlement payment and $1,400,000 in defense costs are covered and therefore reimbursable under any of the policies.

Because the parties have not presented evidence of negotiations or other communications between the City and The Hartford when the City purchased the policies, resolution of the disputes turns on the policy terms, the nature of the coverages, the relation among the coverages, and the reasonable expectations of sophisticated participants in the insurance industry.

### A. Excess policies

At the outset, the City argues that The Hartford's policies were actually "primary" policies because the City's self-insured retention was not an underlying insurance policy. In support of this position, the City quotes a line from the Arizona Supreme Court in *State Farm Mutual Automobile Insurance Co. v. Bogart*: "a self-insurer is not an insurer." 149 Ariz. 145, 150, 717 P.2d 449, 454 (1986).

That line has nothing to do with this case. The point in *Bogart* was that a self-insured rental car company is not, by virtue of being self-insured, an insurer of one of its renters for purposes of "other insurance" clauses in the renter's insurance policies. That unremarkable proposition does not mean the City can ignore its own self-insured retention and access first-dollar coverage from The Hartford. "It is well recognized that self-insurance retentions are the equivalent to primary liability insurance, and that policies which are subject to self-insured retentions are 'excess policies' which have no duty to indemnify until the self-insured retention is exhausted." *Pac. Emp'rs. Ins. Co. v. Domino's Pizza, Inc.*, 144 F.3d 1270, 1276–77 (9th Cir. 1998) (applying California law). Lest there be any doubt, the excess policies' declarations page confirms that the policies cover only "excess liability." (Doc. 69-2 at 2.)

Having clarified the nature of the excess policies, the Court turns to resolving the parties' competing interpretations of specific policy provisions.

### 1. The Hartford has no duty to indemnify the City for any of the settlement.

a. Under the basic insuring clause, quoted above at Part II.B.1.a, The Hartford must indemnify the City for "ultimate net loss" incurred in excess of a $500,000 "retained limit." (Doc. 69-2 at 3.) As also quoted above at Part II.B.1.a, "ultimate net loss" means settlements or judgments for which the City is liable, including court-awarded fees and costs, "but excludes all loss adjustment expenses" of the City and The Hartford. (*Id.* at 10.) The City settled the asbestos claim for $500,000, within its retained limit, so The Hartford has no obligation to indemnify the City for any of the settlement.

b.     The City argues that its pre-settlement defense costs of more than $500,000 "eroded" the retained limit, such that *all* of the settlement was in excess of the retained limit.   It seeks complete indemnification for the $500,000 settlement amount.   This contention defies the definitions of the excess policy.   The declarations page limits coverage to "excess liability."  (*Id.* at 2.)  Under the basic insuring clause, The Hartford's duty to indemnify is limited to excess "ultimate net loss."  (*Id.* at 3.)  "Ultimate net loss" is the sum for which the City is liable to a third party "but excludes all loss adjustment expenses" of the City.  (*Id.* at 10.)  *See Planet Ins. Co. v. Mead Reinsurance Corp.*, 789 F.2d 668, 671–72 (9th Cir. 1986) (interpreting identical definition of "ultimate net loss" as not including defense costs).   These clauses clearly exclude defense costs from counting toward satisfaction of the retained limit.

Even when an excess policy is silent on whether underlying defense costs satisfy the underlying policy limit, it is unreasonable for a sophisticated insured to assume they do.  *See* 1-1 *New Appleman Law of Liability Insurance* § 1.05[2][f] (2015) ("Defense costs under most CGL [commercial general liability] policies are outside of the policy limits, meaning that payment of defense costs by an insurer does not reduce the amount available to pay judgments or settlements."); 3-29A *New Appleman Insurance Law Practice Guide* § 29A.20 (2015) ("An excess carrier that is not specifically told by the insured or its broker that the underlying primary coverage is self-liquidating rightly assumes that defense costs will be paid in addition to the primary policy limits and prices its policy accordingly.").

But there is more.  The excess policies do not merely exclude defense costs from satisfying the retained limit.   They speak explicitly to how defenses costs are to be treated.   As discussed below, the policies disclaim responsibility for all such costs when, as here, the claim is adjusted within the retained limit.   They also require proportional sharing of defense costs if the claim is adjusted for more than the retained limit.   The

City's position that defense costs erode its retained limit contradicts these policy terms as well.

c.      The City relies on a clause in the excess policies, quoted above at Part II.B.1.b, stating that the City's participation in defense costs shall not "exceed the retained limit."  (Doc. 69-2 at 3.)  But that clause must be read in context.  It appears in the policy section titled "Defense, Settlement and Supplementary Payments," not the basic insuring clause.  As explained below, the clause applies only when ultimate net loss is adjusted above $500,000 and the City and The Hartford split defense costs.  In that situation, the clause limits the City's share of defense costs to $500,000.

Although the clause refers to the City's "retained limit," it concerns only the dollar amount of that limit ($500,000).  It does not say that defense costs exhaust that limit for purposes of The Hartford's duty to indemnify.   Rather, the clause relates to The Hartford's separate duty in some circumstances to pay some of the defense costs, as explained below.

### 2.      The Hartford has no duty to pay any of the City's defense costs because the City settled within its retained limit.

a.      The policy section titled "Defense, Settlement and Supplementary Payments" addresses The Hartford's duty to pay the City's defense costs.   The first sentence, which will be referred to as the "No Costs" provision, states that The Hartford shall not pay any defense costs for a claim that is "adjusted" for an amount within the retained limit:

> Should any claim arising from such occurrence be adjusted prior to trial court judgment for a total amount not more than the retained limit, then no loss expenses or legal expenses shall be payable by [The Hartford].

(Doc. 69-2 at 3.)

That provision governs here.  The asbestos claim against the City was adjusted within the retained limit of $500,000.  The No Costs provision places the City in exactly the same position as a primary insurer, which the City used to have before it decided to

save that premium and self-insure for the first $500,000 of loss.  Typically and unless drafted otherwise, the primary insurer is liable for the policy limit in loss indemnification and for unlimited defense costs.

b.      The City argues that the No Costs provision does not apply here because the City "adjusted" the claim for a higher amount than it settled it for.  The City interprets the word "adjusted" to include not only the ultimate settlement amount, but also the amount spent defending the claim on the way to settlement.

The City's interpretation contradicts plain meaning.  The word "adjusted" in the No Costs provision refers to the settlement amount which the City agreed to pay.  Black's Law Dictionary at that time defined "adjustment" as:

> An arrangement; a settlement.  *In the law of insurance, the adjustment of a loss is the ascertainment of its amount and the ratable distribution of it among those liable to pay it.*  The settling and ascertaining the amount of the indemnity which the assured, after all allowances and deductions made, is entitled to receive under the policy, and fixing the proportion which each underwriter is liable to pay.

*Adjustment*, Black's Law Dictionary (5th ed. 1979) (emphasis added).

The City's interpretation also conflicts with surrounding policy language.  As explained, The Hartford's duty to indemnify applies only when the retained limit is exhausted by liability indemnification, not by defense costs.  If the word "adjusted" in the No Costs provision includes both liability and defense costs, then the retained limit would be met for purposes of reimbursing defense costs *before* it is met for indemnity purposes. That makes no sense for an excess policy, which is always grounded on a primary policy (or its equivalent, a self-insured retention), which itself has an underlying duty to defend.

Furthermore, the sentence immediately following the No Costs provision uses the word "adjust" to mean settling or adjudicating the amount of liability excluding defense costs, as discussed below.

c.      Applying the No Costs provision to claims settled within the retained limit harmonizes with the following sentence.  That provision, which will be referred to as the "Proportional Costs" provision, describes when The Hartford must pay a proportion of the City's defense costs and how much:

> However, should the total amount for which such claim might be adjusted prior to such judgment exceed the retained limit, then if [The Hartford] consents to further trial court proceedings, it *shall contribute to legal expenses in the ratio which its proportion of the liability for the judgment rendered, or settlement made, bears to the whole amount of said judgment or settlement*, however in no event shall the [City's] participation in such legal expenses exceed the retained limit . . . .

(Doc. 69-2 at 3 (emphasis added).)    Under this provision, The Hartford's duty to reimburse the City's defense costs is explicitly contingent on, and proportional to, its duty to indemnify some of the City's "liability."  For example, if the City settles a claim for $600,000 and the defense costs are $300,000, The Hartford would be responsible for one-sixth of the settlement liability ($100,000) and therefore one-sixth of the defense costs ($50,000).  Conversely, if the City settles a claim for $500,000 or less, The Hartford would be responsible for none of the settlement liability and none of the defense costs.  In that circumstance, the Proportional Costs provision says the same thing as the No Costs provision in the preceding sentence.  As another court has noted, the No Costs and Proportional Costs provisions taken together "plainly support" the conclusion that the policyholder is "responsible for defense costs for claims it settled within its SIR [self-insured retention] amount."  *City of Oxnard v. Twin City Fire Ins. Co.*, 37 Cal. App. 4th 1072, 1079, 44 Cal. Rptr. 2d 177, 180 (1995).

d.      The last clause of the Proportional Costs provision benefits the City by placing a maximum on the City's "participation in such legal expenses."  (Doc. 69-2 at 3.)  That clause will be referred to as the "Costs Ceiling."  "[S]uch legal expenses" means the legal expenses referred to in that sentence: the expenses of defending a claim that

settles or is adjudicated for more than $500,000.  Although the City generally participates in such defense costs in proportion to its liability, the Costs Ceiling ensures that the City does not pay more than the "retained limit," or $500,000, in such costs.

Whereas the basic insuring clause uses the $500,000 "retained limit" as the amount the City must pay in ultimate net loss before the insurer must pay anything for liability, the Costs Ceiling refers to the "retained limit" as shorthand for a separate $500,000 boundary.  Unlike the basic insuring clause, the No Costs provision, Proportional Costs provision, and Costs Ceiling govern The Hartford's duty to pay defense costs.  Therefore, the Costs Ceiling's reference to the "retained limit" simply incorporates the amount that the limit represents, $500,000, as an independent limitation on the City's responsibility for defense costs.

The City argues that the language of the Costs Ceiling—"in no event" shall the City's "participation in such legal expenses exceed the retained limit"—not only limits the City's proportional sharing obligation established in the same sentence, but also applies in circumstances where the City would otherwise be responsible for all the defense costs.  But insurance policies, like all contracts, should be interpreted to give effect to every provision.  The interpretation of one provision "must not render a related provision meaningless."  *Aztar Corp. v. U.S. Fire Ins. Co.*, 223 Ariz. 463, 476, 224 P.3d 960, 973 (Ct. App. 2010).  The City's argument would extinguish entirely the No Costs provision in the immediately preceding sentence.

The Costs Ceiling is part of and qualifies the Proportional Costs provision, not the No Costs provision.  The Proportional Costs provision's reference to claims that "might be adjusted" for more than $500,000 recognizes that not all claims will be adjusted that high.  The phrase "in no event" does not extend beyond the mutual costs sharing obligation created in the same sentence.  Thus, the Costs Ceiling does not apply here, and The Hartford still has no duty to pay any defense costs.

1
2

### 3. Alternatively, reimbursement of defense costs is allocated across policy periods and no year exceeds the City's retained limit, however calculated.

3

a. Suppose all the foregoing rulings are wrong and the excess policies do

4

impose on The Hartford some duty to pay defense costs once the City incurs at least

5

$500,000 in defense costs, indemnity costs, or both. The question would remain whether

6

the City actually did incur $500,000 in costs, however calculated, in any single policy

7

period. Here, though the City spent more than $1,400,000 in defense costs, those costs

8

were spent defending a claim arising from an occurrence—asbestos exposure—that

9

spanned four of The Hartford's policy periods and twenty-six years altogether.

10

The parties address this complication in different ways. The Hartford says the

11

City's defense costs, like the indemnity obligation, should be allocated across all policies

12

covering the City during the twenty-six-year period of asbestos exposure. On this view,

13

the City never incurred more than the retained limit of $500,000 in any costs in any of

14

The Hartford's policy years. The City, on the other hand, seeks to apply all its defense

15

costs to one policy of its choice. On that view, the City incurred more than $500,000 in

16

defense costs for the selected policy year.

17

This dispute, though it involves the allocation of defense costs, resembles a more

18

familiar debate in insurance law over how to allocate an insured's liability when it arises

19

from a single occurrence spanning multiple policy periods. *See* 1-1 *New Appleman Law*

20

*of Liability Insurance* § 1.10[2] (2015). The Hartford's approach, known as the "pro

21

rata" method, allocates liability among all policies in place during the occurrence. *Id.*

22

The City's approach, known as the "all sums" or "pick and choose" method, allows the

23

insured to select any of the policies to cover the liability, and the insurer on the selected

24

policy may then seek contribution from other insurers. *Id.* Arizona cases are silent,[2] but

25

most states favor pro rata allocation. (*See* Doc. 66-32 at ¶ 109.)

26

27

[2] The Court declines the City's request to certify this question to the Arizona

28

Supreme Court. (Doc. 74 at 12.) The question is not dispositive, as other grounds independently govern this case. The question is not very difficult. There is no urgency to

b.      The City has a threshold problem under its "pick and choose" approach that it did not pick and choose one policy year. It picked and chose four policy years. It made demand and filed suit against The Hartford on its excess and umbrella policies for all four of its years. The City cites no authority that would deny a carrier sued for multiple policy periods, or multiple carriers sued together for multiple policy periods, allocation at least among the policies and the policy periods for which suit is actually brought. Nor would it make any sense to do so. Allocating only among the policy periods for which the City sued The Hartford, and further assuming the City is entitled to repayment of all its ultimate net loss and defense costs, the City's total costs per year would be less than the $500,000 retained limit in each year. The City still would have no claim against The Hartford for any costs.

c.      Even apart from the fact that the City has sued under multiple policy years, pro rata allocation of the City's liability and defense costs makes sense in light of the excess policies' language. The basic insuring clause in each policy is limited to liability "caused by an occurrence, during the policy period." (Doc. 69-2 at 3.) Similarly, the duty to pay defense costs is limited to claims arising from an "occurrence," which is defined as an event that results in bodily injury "during the policy term." (*Id.* at 3, 9.) The most reasonable reading of these provisions is that each policy applies only to liability—and associated defense costs—caused by asbestos exposure that occurred within the policy period. *See Boston Gas Co. v. Century Indem. Co.*, 454 Mass. 337, 358–360 & n.34, 910 N.E.2d 290, 306–08 & n.34 (2009) (interpreting similar policy

answer the question. Even if all the defense and indemnity costs are allocated only among The Hartford's policies on which this action is brought, the City's total indemnity and defense expenses fall short of the $2,000,000 needed to exceed the $500,000 retained limit for any of those four years. No question is worthy of certification if it is not worthy of appeal, and it is not clear that the City would appeal and run up its own attorneys' fees and risk assessment of The Hartford's attorneys' fees on appeal. *See* A.R.S. § 12-341.01(A). If the City does appeal, the Court of Appeals can then decide whether certification is necessary.

language to support pro rata allocation of liability and collecting cases supporting that interpretation).  Notably, the policies do not contain sweeping language obliging The Hartford to pay "all sums" for which the City is liable, as is sometimes argued as a reason for allocating all liability and costs to one policy instead of pro rata.  *See, e.g.*, *State v. Cont'l Ins. Co.*, 55 Cal. 4th 186, 193, 199, 281 P.3d 1000, 1003, 1007 (2012).

Pro rata allocation of liability and defense costs is also consistent with the City's reasonable expectations.  The City cannot have reasonably expected any single one-year occurrence-based policy to cover all its liability and defense costs associated with twenty-six years of asbestos exposure.  *See Boston Gas*, 454 Mass. at 363, 910 N.E.2d at 309 ("No reasonably policyholder could have expected that a single one-year policy would cover all losses caused by toxic industrial wastes released into the environment over the course of several decades.").  This is especially true because The Hartford's policies were excess policies to apply only after the City exhausted a self-insured retention.  Because the excess policies insured less risk than primary policies, they charged relatively low premiums.  Thus, to allow the City to assign all its defense costs in the asbestos lawsuit to one policy year, thereby triggering an excess insurer's duty to pay defense costs, would essentially allow the City to "manipulate the source of its recovery and avoid the consequences of its decision to become self-insured."  *Missouri Pac. R. Co. v. Int'l Ins. Co.*, 288 Ill. App. 3d 69, 82, 679 N.E.2d 801, 810 (1997).

In addition, pro rata allocation serves public policies of fairness and efficiency for courts and litigants alike.  It "avoids saddling one insurer with the full loss, the burden of bringing a subsequent contribution action, and the risk that recovery in such an action will prove to be impossible because, for instance, the insurer of the other triggered policies is unable to pay."  *Boston Gas*, 454 Mass. at 365, 910 N.E.2d at 311 (quoting *Olin Corp. v. Insurance Co. of N. Am.*, 221 F.3d 307, 323 (2d Cir. 2000)).  It also allows courts to divide liability among multiple insurers all at once, rather than slogging through "two separate suits" and risking inconsistent rulings in the absence of overall "guidance

as to how to allocate liability." *Id.* at 364–65, 910 N.E.2d at 311 (quoting *Energy North Natural Gas, Inc. v. Certain Underwriters at Lloyd's*, 156 N.H. 333, 345, 934 A.2d 517, 527 (2007)).   Indeed, if one carrier had to pay the entire loss, it would face the same impossibility of proving actual shares of damages in seeking contribution from the other carriers on the same occurrence—unless that contribution action itself adopted a pro rata approach.

d.      Despite these reasons to adopt pro rata allocation, the City argues that the lack of consensus on the issue is a policy ambiguity that must be resolved in its favor, relying on *City of Glendale v. National Union Fire Insurance Co. of Pittsburgh*, No. CV-12-380-PHX-BSB, 2013 WL 1296418, at *9 (D. Ariz. Mar. 29, 2013).   That case turned on a specific policy term: namely, whether the phrase "invasion of the right of private occupancy" means physical invasion of real property or something broader.   *Id.* at *5. Some jurisdictions had defined the term narrowly, whereas others had defined it broadly. *Id.* at *9.   After reviewing case law, dictionary definitions, and other policy terms, the court deemed the term ambiguous and interpreted it in favor of the insured.   *Id.* at *5–11. That is not this case.

There is no ambiguous policy language concerning allocation over policy periods. There is a difficulty—indeed, impossibility—of proving precisely how much damage arose from asbestos exposure before the policy periods, how much from additional exposure in the policy periods, and how much from yet further exposure in later periods.

Disputes in policy meaning are not central in cases allocating damages for occurrences over time.   The policy language here is crystal clear.   The Hartford is liable only for damages for occurrences within its policy periods.   It is a matter of fact, not policy ambiguity, how much damage was caused by exposure in one policy period when a single occurrence spans multiple policy periods.   The judicial disagreement on allocation is not primarily about policy meaning but about the best balance of efficiency, accuracy, and fairness in finding facts that cannot be proven specifically.   Here, pro rata

allocation of the City's liability and defense costs is the most consistent with policy language and the most reasonable way to resolve that inherently factual matter. Arizona is most likely to follow the pro-rata allocation that most jurisdictions do.

e.    The City argues that allocating an insured's liability is conceptually different from allocating defense costs under a straight duty to defend. For example, the First Circuit recently declined to extend Massachusetts' pro rata method of allocating liability to an allocation of defense costs where the parties had not thoroughly briefed the issue. *Peabody Essex Museum v. U.S. Fire Ins. Co.*, 802 F.3d 39, 52–53 (1st Cir. 2015). In that case, the insurer had an explicit "duty to defend" the insured, *id.* at 46 n.9, and the First Circuit worried that allocating defense costs among policy periods might contravene Massachusetts' "complete defense" rule, under which an insurer with a duty to defend any claim in a lawsuit must defend the entire lawsuit, *id.* at 53 (quoting *GMAC Mortg., LLC v. First Am. Title Ins. Co.*, 464 Mass. 733, 738, 985 N.E.2d 823, 827 (2013)).

Fortunately, those concerns do not apply here. Under all The Hartford's policies, defense costs should be allocated the same way as liability. Unlike the insurer in *Peabody Essex*, The Hartford has no duty to provide a defense under any of its policies. Its only duty as to defense is to contribute to the City's costs in defending itself under the explicit formulas and limits in the policies. (Doc. 69-2 at 3; Doc. 69-3 at 41.)[3] Thus, there is no risk of violating Arizona's complete defense rule, which governs duties to provide a defense, not duties to contribute to the costs of a defense by the insured. *See Regal Homes, Inc. v. CAN Ins.*, 217 Ariz. 159, 169, 171 P.3d 610, 620 (Ct. App. 2007) (stating complete defense rule); *Gulf Chem. & Metallurgical Corp. v. Associated Metals & Minerals Corp.*, 1 F.3d 365, 372 (5th Cir. 1993) (allocating defense costs pro rata and noting that "[t]hough we approve the concept of apportioning the *cost* of an insured's

_____

[3] The City contends the excess policies impose a duty to defend, according to a Ninth Circuit case involving identical policy language. *Planet Ins. Co. v. Mead Reinsurance Corp.*, 789 F.2d 668 (9th Cir. 1986). But that case did not identify any duty to defend apart from a duty to pay defense costs.

defense among those liable for exposure risk during the period for which claims are made against the insured, we do not limit the *duty* of defending the insured"); *accord Sec. Ins. Co. of Hartford v. Lumbermens Mut. Cas. Co.*, 264 Conn. 688, 711–13, 826 A.2d 107, 122–23 (2003) (allocating defense costs pro rata despite objection that duty to defend is broader than duty to indemnify).

      f.     Courts subscribing to pro rata allocation have several methods to apportion liability among policies. *See* 1-1 *New Appleman Law of Liability Insurance* § 1.10[2] (2015). Common methods include apportioning liability based on (1) the time the policy was exposed to injury, known as "time on the risk," (2) the degree of injury that occurred during the policy period, and (3) the time the policy was exposed to the injury, multiplied by the policy's liability limit, known as "time on risk times limits." *Id.* (citations omitted).

      The time-on-the-risk method is the most practical, both in general and here because the underlying settlement resolved no other facts that would permit application of a different method. *See Boston Gas*, 454 Mass. at 370, 910 N.E.2d at 314 ("[T]he time-on-the-risk method of allocating losses is appropriate where the evidence will not permit a more accurate allocation of losses during each policy period."). The other methods risk great complexity and increase in litigation expense, to the cost of insureds and insurers alike, with questionable increase in accuracy. The Arizona Supreme Court is unlikely to adopt a method that would force the insured to try the case he settled in order to get his insurance, when there is a much simpler way to allocate loss fairly among all carriers.

## B. Umbrella policies

      The umbrella policies generally apply only after the excess policies are exhausted. They indemnify excess liability and applicable defense expenses incurred by the City.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**1.      The Hartford has no duty to indemnify the City for any of the settlement or defense costs in this case.**

a.      Under the basic insuring clause, The Hartford must indemnify the City for "ultimate net loss" due to bodily injury in excess of "the underlying limit" or "the self-insured retention," whichever is higher:

> The [Hartford] will indemnify the [City] for ultimate net loss
> in excess of the underlying limit or the self-insured retention,
> whichever is the greater, because of . . . bodily injury . . . .

(Doc. 69-3 at 41.)   The "underlying limit" refers to the coverage limit in the excess policies: $500,000 beyond the City's $500,000 retained limit, or $1,000,000 altogether. (*See id.* at 28, 44.)   The "self-insured retention" refers to a deductible of $25,000 for primary coverages for liability not covered by the excess policies, such as aircraft-related liability.   (*See id.* at 28, 44; Doc. 69-2 at 5.)   Thus, the umbrella policies insure against two types of liability: (1) liability that falls within the scope of the excess policies but exceeds $1,000,000 and (2) liability for other coverage that falls outside the scope of the excess policies and exceeds $25,000.   The City's asbestos liability fell within the scope of the excess policies (*see* Doc. 68 at 8), so this case involves The Hartford's duty to indemnify loss above the excess policies' limit of $1,000,000.

The City did not incur liability above the excess policies' limit, or any liability at all under the excess policies.   Although the City incurred more than $1,400,000 in defense costs, that did not count toward the excess policies' coverage limit as previously discussed.   Because the City did not exhaust excess policy coverage, it cannot access any umbrella coverage.

b.      The City notes that the umbrella policies include defense costs in "ultimate net loss," as quoted above at Part II.B.2.a, which means indemnity under the policies is for applicable defense costs.   (Doc. 69-3 at 44.)   The City also notes that defense costs in the umbrella policies are charged against policies' coverage limit.   (*Id.* at 41.)   From that the City contends the umbrella policies go back to pay for all prior defense costs not

- 24 -

previously insured.  Under the City's argument the umbrella insurer would pay all defense costs in the asbestos lawsuit above $500,000, even though those defense costs were incurred in connection with liability not covered by either the excess or umbrella policies.  That is not how umbrella insurance works.  "Where an excess policy does provide for a duty to defend, that duty will generally not arise until the policy limits of the primary insurer's coverage are exhausted."  1-1 *New Appleman Law of Liability Insurance* § 1.05[2] (2015).  The City's contention is unreasonable, and no insured could have reasonably expected such rights in umbrella insurance even if the policy text did not necessarily preclude it.

In any event, the terms and structure of the umbrella policies preclude the City's interpretation.  The Hartford's duty to pay the City's defense costs is governed by the excess policies until the City's liability reaches $1,000,000.  Only then do the umbrella policies begin to apply.  This structure explains why the umbrella policies list the excess policies as "underlying" and charge a much smaller premium.  (*Compare* Doc. 69-3 at 28 *with* Doc. 69-2 at 2.)  Any duty to defend under the umbrella policies is limited to claims "to which this policy applies" (Doc. 69-3 at 41), and the policy applies only to claims for which the underlying retained limit and excess policy have been exhausted.

**2.    The Hartford had no duty to provide a defense.**

a.    The policy section titled "Investigation, Defense, Settlement" sets forth The Hartford's duty to defend.  As quoted above at Part II.B.2.b, any such duty is limited to claims "to which this policy applies" and "which no underlying insurer is obligated to defend."  (Doc. 69-3 at 41.)  The Hartford has the option to provide the defense, or as happened here, it may "elect[] not to investigate, settle or defend any such claim or suit" and leave the City to provide its defense, as in the excess policies.  (*Id.*)

b.    The City argues that it expected a defense from the beginning of the asbestos lawsuit because the duty to defend under the umbrella policies extends to claims that "no underlying insurer is obligated to defend."  (*Id.*)  All that means is that if an underlying insurer is obligated by its own policy to defend or pay defense costs after its

- 25 -

own duty to indemnify is exhausted, The Hartford's umbrella policies do not take on that duty in place of the underlying carrier for the umbrella tranche of coverage. It protects the umbrella insurer in cases where another policy provides a duplicative duty to defend.

It is common in insurance for liability insurers whose duty to indemnify has been exhausted to continue to have a duty to defend. That is the norm for primary insurance with no excess policy. The same could apply in this array of self-insurance in place of primary insurance, followed by excess insurance, followed by umbrella insurance. To illustrate, suppose the City's liability were high enough to trigger coverage under the excess policies but not the umbrella policies and the City's defense costs exceeded $1,000,000. In that case, the excess carrier (which happens to be The Hartford) would have to reimburse all the City's defense costs above $500,000. This clause in the umbrella policies preserves that duty of an excess carrier to pay those defense costs.

In any event, for purposes of this provision, the City itself is plainly and in substance an underlying insurer expressly obligated to defend and bear the costs of defense, subject to some rights to reimbursement under the excess policies that never came into play. That reality is apparent from the excess policy terms. As has been noted, the City supplanted its earlier primary carrier with itself and took on the obligations of the primary carrier. The City must have been an underlying insurer in the sense of the umbrella policies because the excess policies specifically contemplated that the City would defend certain claims at its own cost, as any primary insurer would.

The City protests that it is not an "underlying insurer" for purposes of the umbrella policies because, as the Arizona Supreme Court observed in *Bogart*, "a self-insurer is not an insurer." 149 Ariz. at 150, 717 P.2d at 454. As has already been discussed, *Bogart* is beside the point. It did not address whether a self-insurer is an underlying insurer for purposes of *its own* excess or umbrella policies. Thus, the City was an "underlying insurer" with a duty to defend for purposes of the umbrella policies.

The City cites two cases in which an excess insurer had a duty to defend even though primary coverage had not been exhausted. *Johnson Controls, Inc. v. London Market*, 325 Wis. 2d 176, 784 N.W.2d 579 (2010); *IMG Worldwide, Inc. v. Westchester Fire Ins. Co.*, 572 Fed. Appx. 402 (6th Cir. 2014). But neither of those cases addressed whether a policyholder with a self-insured retention is an "underlying insurer" for purposes of a higher insurer's duty to reimburse defense costs. Here, under the contractual arrangement between the City and The Hartford as established by the excess and umbrella policies, The Hartford had no duty to defend the asbestos claim.

## IV.   BAD FAITH

The City conceded at oral argument that if The Hartford has no payment obligation under the excess or umbrella policies, then the City has no bad faith claim. There is no payment obligation under the excess or the umbrella policies. Although the analysis could end there, summary judgment on the bad faith claim is also warranted regardless of whether The Hartford has a payment obligation, as explained below.

An insurer has an obligation to play fairly with its insured. *Zilisch v. State Farm Mut. Auto. Ins. Co.*, 196 Ariz. 234, 237, 995 P.2d 276, 279 (2000). This obligation is breached when the insurer (1) acts unreasonably toward the insured and (2) knows, or recklessly disregards, the unreasonableness of its action. *Clearwater v. State Farm Mut. Auto. Ins. Co.,* 164 Ariz. 256, 260, 792 P.2d 719, 723 (1990).

The good faith obligation applies to the processing of a claim as well as the ultimate coverage decision. *Zilisch*, 196 Ariz. at 237–38, 995 P.2d at 279–80. An insurer may not delay an investigation, force an insured to jump through needless hoops, or lowball claims in the hopes that the insured will settle for less. *Id.* at 238. Nor may an insurer deny a claim whose merits are not fairly subject to debate. *Id.* at 237.

Knowledge or reckless disregard of unreasonableness does not require intent to harm, but it requires something more than mistake or inadvertence. *Rawlings v. Apodaca*, 151 Ariz. 149, 160, 762 P.2d 565, 576 (1986). Insurance companies "are far

from perfect.  Papers get lost, telephone messages misplaced and claims ignored because paperwork was misfiled or improperly processed.  Such isolated mischances may result in a claim being unpaid or delayed.  None of these mistakes will ordinarily constitute a breach of the implied covenant of good faith."  *Id.* at 157.  An insurer must have a founded belief in its coverage position.  *Id.* at 160.

The question here is whether there is sufficient evidence from which reasonable jurors could conclude that The Hartford, in processing and ultimately denying the City's claim, "acted unreasonably and either knew or was conscious of the fact that its conduct was unreasonable."  *Zilisch*, 196 Ariz. at 238, 995 P.2d at 280.

## A.    Processing of claim

The City alleges that The Hartford processed its claim in bad faith by, among other things, (1) failing to respond promptly and clearly to the City's tender of defense and requests for information, (2) failing to assert its defenses in a timely manner, (3) changing its coverage positions, and (4) failing to conduct a reasonable investigation. (*See* Doc. 74 at 15–16.)  But the evidence tells a different story.

As to timeliness and clarity of The Hartford's responsive communications, The City tendered its defense on May 2, 2014.  The Hartford responded one week later and asked for proof that the retained limit had been exhausted.  The City provided its evidence of exhaustion on November 6, nearly six months later.  The evidence consisted of an email from the City's attorney stating the amount of the City's defense costs, which was plainly insufficient.  The Hartford immediately clarified that it needed more than that, and it specifically requested invoices and canceled checks.  The City provided the records on December 18, more than one month later and at the beginning of the holiday season.  The Hartford emailed the City on January 13, 2015 to follow up about the records and emailed the City on January 23 to arrange a conference call to discuss exhaustion.

As to timeliness of The Hartford's asserted defenses, The Hartford told the City on November 6, 2014 that the retained limits in each applicable policy period must be exhausted. Its position has naturally developed from there.

As to consistency of The Hartford's coverage position: The Hartford consistently maintained that the retained limits in each policy period must be exhausted and never said it would indemnify or defend the City in the asbestos lawsuit. Although the precise legal basis for The Hartford's position expanded as the dispute evolved, that is an ordinary feature of litigation. The City's legal positions have shifted as well in the course of this dispute and litigation.

There is no evidence that The Hartford wasted time or ignored general or statewide insurance law principles. The timing of The Hartford's actions has been indisputably reasonable and prompt. There is no evidence from which bad faith could be found in processing the claim, much less that The Hartford knew or was conscious of any unreasonableness.

### B.    Denial of claim

The City also alleges that The Hartford denied its claim in bad faith because its coverage position (1) is unreasonable, (2) fails to give the policy its most natural reading, (3) fails to resolve policy ambiguities in the City's favor, (4) selectively relies on certain policy provisions, (5) ignores the fact that the policy is silent on certain issues, and (6) fails to resolve legal uncertainty in the City's favor.

In fact, The Hartford's coverage positions are reasonable even if, contrary to the rulings in this order, they are not correct. Further, The Hartford's position on allocation over policy periods is eminently reasonable, even if the Arizona courts rule otherwise in the future. It could hardly be unreasonable when the majority of jurisdictions adopt it. Good faith does not require insurers to resolve open legal questions in favor of coverage. Rather, insurers are entitled to challenge coverage claims that are "fairly debatable." *Noble v. Nat'l Am. Life Ins. Co.*, 128 Ariz. 188, 190, 624 P.2d 866, 868 (1981) (citing *Anderson v. Cont'l Ins. Co.*, 85 Wis. 2d 675, 271 N.W.2d 368 (1978)). That is true

1   "whether the debate concerns a matter of fact or law." *Anderson*, 85 Wis. 2d at 691, 271

2   N.W.2d at 376.

3           An insurer who blindly denies coverage is not free of bad faith merely because it

4   guessed right, without basis, that coverage would be fairly debatable.  The insurer must

5   have genuinely believed at the time of denial that coverage was fairly debatable, and

6   whether the insurer did so believe is generally an issue of fact.  *See Zilisch*, 196 Ariz. at

7   237, 995 P.2d at 279.  But the City has not presented any evidence sufficient to raise a

8   triable question as to The Hartford's belief in its coverage position.  The Hartford told the

9   City from the beginning that the City must exhaust the retained limits in each applicable

10  policy period before accessing coverage for that period.  Contrary to the City's attempted

11  analogy to *Rowland v. Great States Insurance Co.*, there is no evidence that The Hartford

12  "consciously and unreasonably disregarded the authority" that the City cited, "failed to

13  investigate its own position," or "delayed resolving this dispute," 199 Ariz. 577, 586, 20

14  P.3d 1158, 1167 (Ct. App. 2001).  All the evidence is exactly the opposite.

15          Thus, there is no evidence that The Hartford acted unreasonably in processing or

16  denying its claim, much less that it knew or was conscious of such unreasonableness.

17

18  **V.    EXPERT TESTIMONY**

19          Summary judgment is proper, even if Jeffrey Stempel's opinion testimony is

20  admissible.  But much of it must be excluded in any event.  Stempel is a law professor

21  who has published books and articles on insurance law.  He prepared for the City a thirty-

22  four-page, single-spaced report "to address insurance issues in this matter."  (Doc. 67-2.)

23  His report extends far beyond the range of admissible expert opinions.

24          His report consists largely of legal opinions.  Some of his opinions are

25  interpretations of language in The Hartford's policies, such as the following:

26                  The language of the policies sold to the City do not support
                    the reduction in coverage sought by [The Hartford].
27

28                  . . .

> The most natural reading of this policy language is that the most the City will be required to pay in order for First-Layer coverage to attach is $500,000.
>
> . . .
>
> The natural reading of this language is that where a claim is triggered that implicates the attachment point of the policies, the umbrella insurer has a duty to defend unless an underlying insurer . . . is required to defend.

(*Id.* at 4, 17, 25.)   Some of his opinions are assertions of Arizona insurance law, such as the following:

> Although every contract carries with it an obligation of good faith and fair dealing, the good faith duties surrounding insurance policies are significantly greater than for most non-insurance contracts and under Arizona law can support a tort cause of action for injuries suffered by a policyholder due to insurer bad faith.
>
> . . .
>
> Arizona, like most states, follows the rule that where there is unclear language in a policy, the language is construed against the insurer that drafted the policy unless the textual ambiguity can be readily resolved by reference to extrinsic evidence or context that clarifies the ambiguity.
>
> . . .
>
> Arizona applies the principle that an insurance policy may not be interpreted so as to defeat the reasonable expectations of the insured.   All jurisdictions appear to consider the policyholder's objectively reasonable expectations when construing ambiguous language.   Arizona applies a stronger version of the concept than many states, one in which the language in the portion of the instrument that the customer is not ordinarily expected to read or understand ought not to be allowed to contradict the bargain made by the parties.

(*Id.* at 12, 13, 14 (citations and internal quotation marks omitted).)   Some of his opinions are applications of Arizona law to the facts of this case, such as the following:

1
2
3
4

> Under these circumstances, it was wrongful claims handling
> by Hartford to act in self-interest in the face of Arizona law
> by self-servingly assuming that Arizona law supported
> allocation among insurers that forced a policyholder to pay
> multiple [self-insured retentions] . . . .

. . .

5
6
7
8
9
10

> In the absence of any Arizona precedent favoring its position
> (and no state Supreme Court decisions on the issue), an
> insurer meeting the "equal consideration" standard of care
> would resolve the allocation/apportionment conflict in favor
> of the policyholder until such time as the insurer could obtain
> a judicial ruling in its favor or at least point to controlling
> favorable and sufficiently analogous precedent. Hartford did
> not do this . . . .

. . .

11
12
13
14
15
16
17
18
19

> For the reasons set forth above, it is my opinion that
> Hartford's conduct toward the City fell below the applicable
> standard of care required of insurers acting in good faith
> toward policyholders and also violated unfair claims practices
> legislation. . . . In addition, in light of Hartford's slow and
> inadequate claims handling response, unreasonable coverage
> position, and failure to adequately investigate and consider
> Arizona law, it appears that Hartford acted with willful
> indifference and in conscious disregard of the interests of its
> policyholder and is subject to punitive damages.

20

(*Id.* at 23, 30, 35.)

21
22
23
24
25
26
27
28

   None of this is legitimate expert testimony. Federal Rule of Evidence 702 permits an expert to testify only if the testimony "will help the trier of fact to understand the evidence or to determine a fact in issue." An expert "cannot give an opinion as to her *legal conclusion*, i.e., an opinion on an ultimate issue of law. Similarly, instructing the jury on the applicable law is the exclusive province of the court." *Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1058 (9th Cir. 2008). As illustrated above, much of Stempel's report invades the province of the court by expounding law or invades the province of the jury by resolving facts. The material facts on these motions are not in

dispute.  Some of his opinions are incorrect under Arizona law.  Some fail to take account of undisputed facts or have no basis in the evidence before this Court on summary judgment.

The City attempts to analogize Stempel's report to testimony deemed admissible in *Hangarter v. Provident Life & Accident Insurance Co.*, 373 F.3d 998, 1016–17 (9th Cir. 2004).  That analogy fails.  The expert witness in *Hangarter* merely made passing "references" to legal provisions and never actually "reached a legal conclusion."  *Id.*  Stempel does not just "refer" to legal provisions; he spends pages detailing insurance law, complete with case citations.  He offers to testify that The Hartford breached the terms of its policies, acted in bad faith, and deserves punitive damages.  None of that is admissible on this record; indeed, it is all incorrect.

Thus, Stempel's report will be excluded to the extent that it asserts legal principles, reaches legal conclusions, or asserts facts contrary to or unsupported by the record on these motions.  Nothing else in Stempel's report is both admissible and sufficient to controvert The Hartford's motion for summary judgment.

## VI.    MOTION TO TRANSFER

Two months after the City and The Hartford filed their cross-motions for summary judgment in this case, Berkshire Hathaway Specialty Insurance Company ("Berkshire") filed an action before a different judge of this court.  *Berkshire Hathaway Specialty Ins. Co. v. City of Phoenix, et al.*, No. 2:16-cv-01083-PHX-JAT.  Berkshire's complaint in that action alleges as follows.

Berkshire was one of the City's other insurers during the twenty-six years in which Carlos Tarazon was exposed to asbestos.  It insured the City against excess bodily injury liability from July 1, 1976 to July 1, 1977.  The terms and structure of Berkshire's policy differed somewhat from The Hartford's policies.  For example, Berkshire agreed to indemnify the City above a $300,000 self-insured retention, and its basic insuring clause referred to "all sums" for which the City is liable.

During the Tarazon asbestos lawsuit, the City demanded coverage from Berkshire. However, the City did not give Berkshire information from which it could evaluate whether the asbestos claim exceeded the City's self-insured retention, despite Berkshire's requests for information and the City's duty to provide it. Moreover, the City settled the asbestos claim without Berkshire's knowledge or consent, despite the City's duty to notify Berkshire of settlement negotiations and obtain its consent for settlement.

Shortly after the City settled the Tarazon lawsuit, a second City worker, Francisco Herrera, sued the City for asbestos-related injury. Once again, Berkshire was one of the City's insurers during the period of asbestos exposure. As before, the City demanded coverage from Berkshire, but the City did not adequately respond to Berkshire's requests for information and other communications. Herrera's action is pending.

The City has not sued Berkshire with respect to either the Tarazon action or the Herrera action. The City has opposed The Hartford's attempt to include Berkshire as a party in this case. (Docs. 24, 28.) Thus, Berkshire's complaint seeks only declaratory judgments that (1) the City's failure to cooperate with Berkshire in the Tarazon and Herrera actions extinguishes any duty to indemnify, (2) the City's failure to notify Berkshire and obtain its consent as to settlement in the Tarazon action extinguishes any duty to indemnify, (3) the Tarazon and Herrera actions are separate "occurrences" such that the City must exhaust its $300,000 self-insured retention in each action before coverage can arise, (4) the City's decision to sue The Hartford and not Berkshire means Berkshire does not owe anything until The Hartford's coverage is exhausted, (5) any liability covered by Berkshire's policy should be allocated pro rata among all relevant insurers, and (6) Berkshire is entitled to reimbursement from other insurers in the event it pays more than its pro rata share of liability. Berkshire's complaint names the City and a multitude of other insurers, including The Hartford, as defendants.

The Hartford moves to transfer Berkshire's case to the undersigned judge. Local rules provide, in relevant part, that a party may move to transfer a case to a judge with a

related case if the cases (1) "arise from substantially the same transaction or event," (2) "involve substantially the same parties or property," (3) "call for determination of substantially the same questions of law," or (4) would "entail substantial duplication of labor if heard by different Judges."  LRCiv 42.1(a).  A principal factor is whether party economy or judicial economy is substantially served by transfer to another judge.

Although Berkshire's case involves some of the parties and transactions involved in this case, there are substantial differences.  Berkshire itself is not a party in this case, nor are any of the other insurers except The Hartford.  Some of Berkshire's claims involve its duty to indemnify the City for the Tarazon claim and defense, as does this action against The Hartford.  But the transactions between the City and The Hartford were different from the transactions between the City and the other insurers.  The arrays of coverage varied from year to year.  Berkshire and the other carriers insured the City under different policy language.  The City's communications with Berkshire were sparser than its communications with The Hartford.  The Herrera claim arises from different facts.  Most of the legal questions Berkshire attempts to raise were not raised in this case.  The questions decided in this order generally could not arise in Berkshire's case unless earlier questions are resolved against Berkshire.

At the outset, Berkshire's case raises serious questions of ripeness and the need for declaratory judgment, given that the City has not sued Berkshire and may never do so.  If the rulings in this order are correct, there will be no reason for the City to sue Berkshire on the Tarazon claim because Berkshire's one twenty-sixth share of the City's total indemnity and defense costs is under $80,000, far less then Berkshire's $300,000 self-insured retention.  Though the City's expenses on the Herrera action cannot be known until the action is concluded, it is similarly unlikely that those expenses will be high enough to exhaust the retention.  The City and some of the insurer-defendants have moved to dismiss Berkshire's case on some of those grounds.

Finally, declining to transfer Berkshire's case would not create any substantial duplication of labor.  The parties in this case cross-moved for summary judgment two months before Berkshire's case was even filed, and those motions have now been decided in a case-dispositive way.  The only remaining questions are in Berkshire's case.  Only one judge will work on those questions, whether or not the case is transferred.  The motion to transfer will be denied, leaving Berkshire's case in capable hands.

IT IS THEREFORE ORDERED that Defendants' Motion for Summary Judgment (Doc. 65) is granted.

IT IS FURTHER ORDERED that the City's Motion for Partial Summary Judgment (Doc. 68) is denied.

IT IS FURTHER ORDERED that Defendants' Motion to Exclude Expert Testimony of Jeffrey Stempel (Doc. 67) is granted to the extent stated in this order.

IT IS FURTHER ORDERED that Defendants' Motion to Transfer Related Case (Doc. 78) is denied.

IT IS FURTHER ORDERED that the Clerk enter judgment against Plaintiff City of Phoenix and in favor of Defendants First State Insurance Company, Twin City Fire Insurance Company, New England Reinsurance Corporation, and Nutmeg Insurance Company that Plaintiff take nothing.

The Clerk shall terminate this case.

Dated this 2nd day of September, 2016.

Neil V. Wake
Senior United States District
Judge